**THIS ORDER IS SIGNED AND ENTERED.**

Dated: August 24, 2011

_____
**Hon. Robert D. Martin
United States Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

In re:

Renew Energy LLC,

           Debtor.

(Chapter 11)

Case No. 09-10491

U.S. Bank National Association

           Plaintiff,

v.

Plains Marketing Canada LP,

           Defendant.

Adv. No. 11-00031

MEMORANDUM DECISION

Renew Energy LLC filed for bankruptcy relief under chapter 11 on January 20, 2009. On July 1, 2010, a plan was confirmed, which vested U.S. Bank National Association ("trustee") with the right to administer all remaining assets of the debtor, including any funds recovered

through preference claims.  The trustee commenced this action against Plains Marketing Canada ("Plains ") on January 28, 2011 under § 547(b) to recover roughly $808,000 in payments made by the debtor in the ninety days before filing bankruptcy.  Plains has moved for summary judgment.

The debtor operated an ethanol plant in Aztalan, Wisconsin.  In its operations, it used large amounts of denaturant grade natural gasoline ("natural gasoline,") which it purchased from Plains.  Plains is a transporter and supplier of crude oil, liquefied petroleum gas, and other petroleum products.  It buys and sells natural gasoline, but does not produce it.  Because the price of gasoline fluctuates, Plains' profitability is subject to the volatility of the natural gasoline market.  Plains manages this risk by entering into sales contracts to sell gasoline at specified prices for future delivery.

In February 2008, Plains entered into two contracts with the debtor for the sale of natural gasoline, referred to as Contract 954 and Contract 955.   Each had a cover sheet, on Plains letterhead, with the title "sales contract."  Contract 954 was negotiated on February 1, 2008, and required Plains to deliver "220 tank trucks approximately" over the term of the contract, with "up to 20 trucks" delivered each month. Payment for each delivery was due within 10 days of the invoice date, and the negotiated price was set at "Mont Belvieu Non TET Month Average C5+ Plus .32" per gallon delivered.  The term "Mont Belvieu Non TET Month Average C5+" referred to an index price commonly used in the industry. Listed under the "additional terms," section of the contract was a term stating that "the first (8) trucks per month will fall under a separate fixed price contract and the remainder will go under this basis priced contract."  Contract 954 expired on December 31, 2008.  The contract was signed by a representative from Plains on February 5,

2

2008, and by a representative of the debtor on February 19, 2008.  On February 26, 2008, Plains made its first delivery of gasoline pursuant to this contract.

On February 4, 2008, the debtor and Plains negotiated Contract 955.  Pursuant to that contract, the debtor agreed to pay Plains $2.29 a gallon for Plains to deliver "88 tank truck" of natural gasoline over the term of the contract, with 8 trucks to be delivered each month.   Like Contract 954, this contract expired on December 31, 2008, and required payment within 10 days of each invoice date.   On February 5, 2008, a representative from Plains signed the contract, which was followed by the debtor's signature on February 19, 2008.  On February 4, 2008, Plains delivered its first shipment under this contract.

On October 28, 2008, the debtor and Plains entered into a third contract, Contract 1060.  This contract was negotiated on October 28, 2008, and expired four days later on October 31, 2008.  Pursuant to the contract, Plains was to deliver "3 tank truck" at a fixed price of $1.60 per gallon.  The contract was signed by a Plains representative on October 30, 2008 and a representative for the debtor on November 17, 2008.  The first delivery under Contract 1060 occurred on October 28, 2008, with two additional deliveries occurring on October 29 and October 30, 2008.  The contract required payment from the debtor within five days from the invoice date.

From February 2008 until December 31, 2008, Plains delivered natural gasoline pursuant to the terms of Contracts 954 and 955.  Several weeks to one month after each delivery, Plains would send the debtor an invoice.  During the eleven-month relationship the debtor rarely, if ever, submitted timely payments.  All payments were made via wire transfer, and most payments were for multiple invoices.  Prior to the preference period, the debtor made payments from 7 to 40 days after the invoice date, averaging 18 days after.  During the ninety days before the debtor

3

filed for bankruptcy, the debtor paid its invoices to Plains from 7 to 26 days after the invoice date, averaging 15 days after. During the preference period, the debtor made payments of roughly $808,000 to Plains under the three contracts.

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The primary purpose of summary judgment is to avoid trial where there is no genuine issue of material fact in dispute. *See Trautvetter v. Quick,* 916 F.2d 1140, 1147 (7th Cir. 1990). Drawing all inferences in favor of the nonmoving party, each defense Plains raises is considered below.

### A. Safe Harbor § 546(e)

Plains argues that the payments made for the delivery of gasoline are protected because they constitute "settlement payments" pursuant to three "forward contracts," which cannot be avoided under § 546(e). Congress first enacted this safe harbor in 1982 to "minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting [the financial] industries." H.R.Rep. No. 97-420, p. 1 (1982), *reprinted in* 1982 U.S.C.C.A.N. 583, 583 (§ 546(e) was originally enacted as § 546(d), but was later designated as § 546(e)). Congress sought to prevent market instability when a commodities or securities firm became insolvent. *Id*. 1982 was near the start of an agricultural credit crisis in the United States, when many grain storage facilities and many more farmers were resorting to bankruptcy. There was a reasonable fear that the recovery of preferences from sellers of grain and other commodities would further destabilize crucial markets. In 1990, Congress expanded

4

the scope of § 546(e) to apply to settlement payments made under forward contracts by forward contract merchants. H.R.Rep. No. 101-484, p. 4 (1990), *reprinted in* 1990 U.S.C.C.A.N 223, 226. The purpose of the amendment was to "keep pace in promoting speed and certainty in [] complex financial transactions" and once again to "minimize volatility" in the financial markets. *Id.* at 2.

When expanding § 546(e), Congress intended to distinguish between a forward contract and an ordinary commodity purchase or sale. *Id*. at 3. Congress noted that "[t]he primary purpose of a forward contract is to hedge against possible fluctuations in the price of a commodity. This purpose is financial and risk-shifting in nature, as opposed to the primary purpose of an ordinary commodity contract, which is to arrange for the purchase and sale of the commodity. If the price of a commodity – such as crude oil or soybeans – rises or falls on some future date, the buyer or seller can minimize the risk involved through the use of forward contracts to offset the fluctuation in price from the date of the agreement to the actual date of transfer or delivery" *Id*. Acknowledging the purpose behind protecting forward contracts from avoidance, several bankruptcy courts have looked to the contracts' language, purpose, and the parties' motives in order to determine whether a certain contract qualifies as a "forward contract." *See MBS Management*, 432 B.R. 570, 575 (Bankr. E.D. La. 2010); *National Gas Distributors*, 369 B.R. 884, 894-95 (Bankr. E.D.N.C. 2007) (distinguishing the *Olympic* case, and concluding that the contracts were nothing more than "simple supply contracts."). For example, in *MBS Management*, Judge Magner heard testimony from an expert in commodity trading of electricity, who described the common attributes of forward contracts for the sale of electricity. *MBS Management*, 432 B.R. at 575. The expert's testimony regarding the hedging nature of the contract satisfied the court that it was indeed a forward contract. *Id*.

5

While this background information is helpful in determining if the contracts at issue are the type of contracts Congress had in mind when enacting the Safe Harbor Provision of § 546(e), a proper analysis begins with the statutory language. Bankruptcy Code § 546(e) in relevant part provides:

> Notwithstanding sections 544, 545, 547,…, the trustee may not avoid a transfer that is a … *settlement payment*, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, *forward contract merchant*, stockbroker, financial institution, financial participant, or securities clearing agency...". 11 U.S.C. § 546(e) (emphasis added).[1]

To establish a defense under § 546(e), the evidence must show that debtor's payments to Plains were: (1) settlement payments; (2) made to or by a "forward contract merchant." These elements will be considered in turn.

**1. Settlement Payment**

The Bankruptcy Code defines "settlement payment" as, "for purposes of the forward contract provisions of this title, a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, a net settlement payment, or any other similar payment commonly used in the forward contract trade." 11 U.S.C. § 101(51A). While the statute's tautology does not provide defining characteristics, it is reasonably clear that a "settlement payment" follows the maturity of a forward contract and consists of the consideration to settle (or complete all obligations under) that contract. *See generally In re Enron Creditors Recovery Corp.*, 422 B.R. 423, 440-41 (S.D.N.Y. 2009) (implying that settlement payments generally arise at the maturity of a negotiable or financial instrument). Use of the phrase "settlement payment" rather than simply "payment" suggests that

---

[1] Because neither Plains nor the debtor has argued that either is a "commodity broker," it is not necessary to analyze or apply any definitions provided in 11 U.S.C. § 761, even though the section is referenced in § 546(e). See 11 U.S.C. § 103(d) ("[s]ubchapter IV of chapter 7 of this title applies only in a case under such chapter concerning a commodity broker.").

the obligation arose under a forward contract rather than a simple commodity purchase contract. Therefore, we must determine whether the contracts at issue are forward contracts before concluding that the payments fulfilling them qualify as settlement payments under § 546(e) and § 101(51A).

The Bankruptcy Code defines "forward contract" as "a contract (other than a commodity contract) for the purchase, sale, or transfer of a commodity, or product or byproduct thereof, with a maturity date more than two days after the date the contract is entered into…". 11 U.S.C. § 101(25)(A). There is no doubt that natural gasoline is a commodity. *See Mirant*, 310 B.R. 548, 565 (Bankr. N.D. Tex. 2004). The maturity date of these contracts is less clear.

To date, no court has explicitly defined the term "maturity date." The trustee cites *Lightfoot v. MXenergy, Inc.*, 2011 WL 1899764, *4 (E.D. La. May 19, 2011), which implies that the date of first delivery is in fact the forward contract's maturity date for the purposes of the two-day requirement under § 101(25). The trustee points out that Contract 955 was negotiated February 4, 2008, and the first date of delivery was also February 4, 2008. Likewise, Contract 1060 was negotiated the same day of the first delivery. In light of this, the trustee concludes that Contract 955 and Contract 1060 do not meet the statutory requirement of "maturity date," more than two days after that contract was entered into. However, in *Lightfoot*, because the first date of delivery was clearly outside the two-day period, the court did not inquire further, as it concluded that the statutory requirement was met. Therefore, the trustee's reliance on this case for a complete definition of "maturity date" is misplaced.

In the absence of any helpful definition in the Bankruptcy Code or the Uniform Commercial Code, a common sense (and usage) definition of "maturity date" is the date that all other

7

obligations under the contract have been performed, and nothing else need be done except tender payment. Common usage in the context of forward contracts suggests that it refers to the date on which delivery has occurred and payment to "settle" is due. The word "mature," used in § 101(25A), suggests a single date and meant the "due date for commencement of performance," but Congress did not intend to restrict the number of times a forward contract can mature. *See Mirant*, 310 B.R. 548, 564 & n.26 (Bankr. N.D. Tex. 2004). In support of this broad interpretation, the *Mirant* court cited the legislative history, which states that "[A] forward contract merchant often has a series of forward contracts with the same customer, which are then set off and netted out." *Id.* (citing H.R.Rep. No. 101–484, p. 4 (1990)). The court concluded that multiple maturity dates can arise under one or more forward contracts. *Id.* Providing further (though limited) guidance, Black's Law Dictionary defines "date of maturity" as the date an obligation becomes due. BLACK'S LAW DICTIONARY, 452 (9th ed. 2009). This implies that if there is more than one delivery date, there is more than one date an obligation becomes due.

In this case, Contracts 954 and 955 clearly fall under the definition of a forward contract in § 101(25). The portions of these contracts on which the disputed payments were made matured more than two days after the contracts were entered into. Contract 954 was negotiated on February 1, 2008. Neither party disputes that multiple deliveries occurred under this contract. The first payment in the preference period occurred November 14, 2008, pursuant to a delivery that occurred September 20, 2008. Since this contract's maturity date is comfortably outside the two-day period, no further inquiry need be made. Likewise, Contract 955 was negotiated on February 4, 2008. The first payment in the preference period occurred November 14, 2008, pursuant to a delivery that occurred September 15, 2008. Therefore, because Contracts 954 and

8

955 involve a transfer of a commodity and matured more than two days after they were entered into, these contracts qualify as "forward contracts" under 11 U.S.C. § 101(25).

Contract 1060, however, does not qualify as a forward contract under this definition. It was negotiated on October 28, 2008. The first delivery date under this contract was October 28, 2008. The last delivery date was October 30, 2008. By October 30, all obligations under Contract 1060 were satisfied, except issuing the invoice and collecting the payment. This was a simple commodity purchase contract. It did not mature more than two days after it was entered into. It fails under the statutory definition and is not a forward contract for the purposes of § 546(e). Because it is not a forward contract, payments on it were not "settlement payments."

This analysis may be supplemented by examining the nature of the contracts in hedging against market volatility. Plains has satisfactorily demonstrated that Contracts 954 and 955, by operating together, were formed to hedge the risks of an unstable gasoline market. While the first eight tank trucks delivered each month were subject to a flat rate of $2.29 per gallon of natural gasoline, protecting the debtor from higher market prices and Plains from lower, tank trucks twelve through twenty were subject to an index price, plus an additional $0.32 per gallon. The practice of "adding or subtracting from the index is done because the index does not represent the market price, but the value established through a calculation that takes into consideration the actual trades that were executed and reported of a certain type for a specified period of time." (Def.'s Mem. Supp. Summ. J. at 7 (citing Broxson Aff. ¶ 12.)) When an index based price is adjusted with the use of an adder (or a discount as the case may be) to reach a negotiated price for a defined term, the index plus the adder "allows market participants to hedge transactions with more precision, and guard against negative price movement impacts in these transactions." *Id*. This is precisely the type of contract Congress intended to protect when

9

drafting 11 U.S.C. § 546(e) and the pertinent definitions in § 101. Because Contracts 954 and 955 qualify as "forward contracts" under 11 U.S.C. § 101(25), the payments associated with these contracts are settlement payments for the purposes of §101(51A).

### 2. Forward Contract Merchant

The Bankruptcy Code defines "forward contract merchant" as "an entity the business of which consists in whole or in part of entering into forward contracts." 11 U.S.C. § 101(26). Plains has demonstrated that it is a forward contract merchant by showing that Contracts 954 and 955 qualify as forward contracts. Plains is a Forward Contract Merchant under § 546(e), to whom settlement payments were made during the preference period.

There is no genuine issue of fact, and Plains has satisfied its burden and proved the elements of § 546(e). No fact that could be elicited at trial would change the analysis above. Therefore, Plains is entitled to summary judgment as to payments received under Contracts 954 and 955.

### B. Ordinary Course of Business Defense

Plains argues that all payments from the debtor, paid within 90 days of the petition, were made in the "ordinary course of business" and are therefore, unavoidable under § 547(c)(2). We need now consider only the single payment made on Contract 1060. To establish that payment was made in the "ordinary course of business," Plains must establish that either the payment: (A) was "made in the ordinary course of business or financial affairs of the debtor and the transferee;" or (B) was "made according to ordinary business terms." 11 U.S.C. § 547(c)(2). When analyzing whether payments fall within § 547(c)(2), the court must look at the established practices of the parties' business relationship. *See In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029,

10

1032 (7th Cir. 1993). Whether a payment was made in the "ordinary course of business" depends on: (1) the length of time the parties were engaged in the transaction at issue; (2) whether the amount or form of tender differed from past practices; (3) whether the debtor or creditor engaged in unusual collection or payment activity; and (4) whether the creditor took advantage of the debtor's financial distress. *Kleven v. Household Bank F.S.B.*, 334 F.3d 638, 642 (7th Cir. 2003). Late payments are considered within the "ordinary course of business" if the terms of the parties' business agreement was modified prior to the preference period. *Matter of Xonics Imaging Inc.*, 837 F.2d 763, 766 (7th Cir. 1988). When analyzing the transactions, courts frequently look to the creditor's billing cycle and pay close attention to the past payment history. *See, e.g., Tolona Pizza,* 3 F.3d at 1033.

Despite filing nearly 250 pages of documents relating to Plains' business relationship with the debtor, a factual uncertainty remains. Plains provided the court with a spreadsheet showing that during the time prior to the preference period, the debtor paid its invoices from Plains anywhere from 7 to 40 days late, or on average 18 days late. In contrast, during the preference period the debtor made payments anywhere from 7 to 26 days late, or on average 15 days late. While the differences in these calculations may be minimal, more evidence as to the debtor's payment practice with Plains, as well as evidence of Plains general billing practices, is needed to establish the payment of Contract 1060 was made "in the ordinary course." For this reason, there is still a genuine issue of fact that exists for a defense under § 547(c)(2), and summary judgment is not appropriate.

11

**C. New Value Defense**

Plains argues the payments made are nonavoidable under the "new value" defense. The new value defense under 11 U.S.C. § 547(c)(4) provides:

> The trustee may not avoid under this section a transfer—to or for the benefit of a creditor, to the extent that, after such transfer, each creditor gave new value to or for the benefit of the debtor—
> (A) Not secured by otherwise unavoidable security interest; and
> (B) On account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor. 11 U.S.C. § 547(c)(4).

A creditor establishes that "new value" was given if: (1) after receiving a preferential transfer, the creditor advanced additional credit to the debtor on an unsecured basis; and (2) the additional post-preference unsecured credit was unpaid in whole or in part as of the date of the bankruptcy petition. *See In re Globe Bldg. Materials, Inc.*, 484 F.3d 946, 949 (7th Cir. 2007). If a creditor establishes that it gave "new value" in exchange for the preferential transfer, then it may offset the value exchanged by the amount of new value paid. "New value" is measured at the time the debtor takes possession of the transferred goods. *Id.* at 951.

Based on the evidence provided, it cannot be determined whether Plains provided any new value to the debtor pursuant to Contract 1060 during the preference period. An affidavit provided by Donna Chizon suggests that two deliveries for gasoline were made to the debtor on January 5 and January 7, 2009. However, other than this affidavit, Plains has provided no evidence of these deliveries and no evidence as to whether they were connected to Contract 1060. Therefore, Plains has not met its burden to justify granting its motion for summary judgment under § 547(c)(4).

For the reasons stated above, Plains is entitled to summary judgment as to Contracts 954 and 955. It may be so ordered.